983 F.2d 1267
 60 Empl. Prac. Dec. P 41,984
 COMMONWEALTH OF PENNSYLVANIA
and
Guardians of Greater Pittsburgh, Inc., individually and on
behalf of its members and on behalf of all others similarly
situated; National Association for the Advancement of
Colored People--Pittsburgh Branch, individually and on
behalf of its members and on behalf of all others similarly
situated; National Organization for Women--Southwestern
Pennsylvania Council of Chapters, individually and on behalf
of its members and on behalf of all others similarly situated,
and
Donald Allen, Benjamin Ashe, Jerome Aziz, Richard Hurt, Adam
Kinsel, Lynnwood Scott and Richard Stewart, individually and
on behalf of all others similarly situated; J. Terese
Doyle, individually and on behalf of all others similarly
situated; Cheryl Edmonds, Rose Mitchum, Linda Robinson,
Joanne Rowe, Deborah Smith and Gloria Vanda, individually
and on behalf of all others similarly situated; Harvey
Adams, Mack Henderson, Theodore Saulsbury, and Charles
Tarrant, individually and on behalf of all others similarly
situated, Gladys Smith, individually and on behalf of all
others similarly situated
v.
Peter F. FLAHERTY, Mayor of the City of Pittsburgh and
Acting Director of the Department of Public Safety of the
City of Pittsburgh; Robert J. Coll, Superintendent of the
City of Pittsburgh Bureau of Police; Stephen A. Glickman,
President of the City of Pittsburgh Civil Service
Commission; Albert Statti and Edward L. English, Members of
the City of Pittsburgh Civil Service Commission; Melanie J.
Smith, Secretary and Chief Examiner of the City of
Pittsburgh Civil Service Commission; and City of
Pittsburgh, all individually and in their official capacities
v.
COMMONWEALTH OF PENNSYLVANIA,
Fraternal Order of Police (Intervenor in D.C.).
Michael C. SLATER
v.
CITY OF PITTSBURGH, a municipal corporation.
Charles H. BOEHM; Paul G. Clark and Richard Usner, on
behalf of themselves and all others similarly situated
v.
Sophie MASLOFF, Mayor of the City of Pittsburgh; Melanie J.
Smith, Director of Personnel of the City of
Pittsburgh; the Pittsburgh Civil
Service Commission and the
City of Pittsburgh,
Commonwealth of Pennsylvania, Appellant.
 No. 92-3031.
 United States Court of Appeals,
Third Circuit.
 Argued Sept. 25, 1992.
Decided Jan. 20, 1993.
 
 Thomas F. Halloran, Jr. (argued), Office of the Atty. Gen. of Pennsylvania, Pittsburgh, PA, for appellant.
 Mary P. Portis, Portis & Associates Pittsburgh, PA, for appellee National Ass'n for the Advancement of Colored People, Pittsburgh Branch.
 Samuel J. Cordes (argued), Ogg, Jones, DeSimone & Ignelzi, Pittsburgh, PA, for appellees Paul G. Clark and Richard Usner.
 Robert B. Smith (argued), City of Pittsburgh, Dept. of Law, Pittsburgh, PA, for appellees Albert Statti, Edward L. English, Melanie J. Smith, City of Pittsburgh, Peter F. Flaherty, and Robert J. Coll.
 Ronald D. Barber (argued), Strassburger, McKenna, Gutnick & Potter, Pittsburgh, PA, for appellees Daniel A. Dulski and Michael A. Benner.
 Before: MANSMANN, ROTH and ROSENN, Circuit Judges.
 OPINION OF THE COURT
 MANSMANN, Circuit Judge.
 
 
 1
 In this appeal from a grant of summary judgment denying the Commonwealth's request for equitable relief and upholding the dissolution of a preliminary injunction aimed at remedying unlawful discrimination in the hiring practices of the Police Department for the City of Pittsburgh, we focus primarily on whether injunctive relief has continued justification in light of the Supreme Court's decision in Washington v. Davis, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), which mandates that discriminatory intent be proven as an element of the prima facie standard for Constitution-based civil rights claims. This case is unusual because the preliminary injunction remained in effect for more than fifteen years, during which time no party sought to pursue the action on the merits or to dispose of the issue of permanent injunctive relief.
 
 
 2
 In the face of the original parties' apparent reluctance to pursue an adjudication of their claims on the merits, intervening defendants, police officer applicants who alleged harm as a result of the terms of the preliminary injunction, demanded adjudication on the merits and received a judgment in their favor which dissolved the preliminary injunction. This appeal itself purports only to seek restoration of the preliminary injunction until such time in the future as certain alleged injustices in the Pittsburgh Police Force's hiring procedures are remediated.
 
 
 3
 The unprecedented protraction of time during which the "preliminary" injunction has remained operative suggests to us that the request to restore it is de facto a request for a grant of a permanent injunction. The district court's order of summary judgment against the Commonwealth on the issue of police hiring procedures from which this appeal is taken in fact denies the Commonwealth's initial request for permanent injunctive relief prayed for in its 1975 complaint. We have reviewed the evidence in a light most favorable to the Commonwealth and determine that there is no genuine issue of material fact concerning the chief issue presented; indeed there is no evidence of discrimination, indirect or otherwise, which would support a determination that the City is purposefully and currently engaged in unlawful discrimination. Because we thus conclude that the district court properly denied permanent injunctive relief, we will affirm the district court's grant of summary judgment to the Intervenors.
 
 
 4
 We discuss separately the district court's assessment of Intervenors' attorney's fees against the Commonwealth and the City, in light of the jurisdictional question of whether an unquantified award is properly appealable under 28 U.S.C. § 1291 as a final decision of the district court.
 
 I.
 
 5
 Since this is an appeal from a final judgment affirming a grant of summary judgment, we have jurisdiction pursuant to 28 U.S.C. § 1291. Where the judgment on the underlying merits of the case is final, the decision on the merits becomes immediately appealable, even where an award of attorney's fees remains unliquidated. Budinich v. Becton Dickinson and Co., 486 U.S. 196, 108 S.Ct. 1717, 100 L.Ed.2d 178 (1988). See also White v. New Hampshire Dept. of Employment Secur., 455 U.S. 445, 452, 102 S.Ct. 1162, 1166, 71 L.Ed.2d 325 (1982) (merits and fees are "uniquely separable"); West v. Keve, 721 F.2d 91, 93 (3d Cir.1983); In re Colon, 941 F.2d 242 (3d Cir.1991); Confer v. Custom Eng'g Co., 952 F.2d 41 (3d Cir.1991). The district court assumed jurisdiction under 28 U.S.C. §§ 1331 and 1343.
 
 II.
 
 6
 We set forth the salient historical facts undisputed in the district court in the light most favorable to the Commonwealth.
 
 A.
 
 7
 In the hope of remediating the historical underrepresentation of African-Americans and females in the City of Pittsburgh Police Force, the Commonwealth of Pennsylvania filed an action against the City in 1975 alleging unlawful discrimination in the hiring of police officers, in violation of 42 U.S.C. §§ 1981, 1983 and the 13th and 14th Amendments. Concluding that the City's reliance on an applicant's score on a written ranking exam had the effect of disproportionately eliminating minorities and women from the City's police force, the district court entered a preliminary injunction which prescribed a quota hiring system whereby for every white male hired by the City, the City was enjoined to hire one qualifying African-American male, one white female, and one African-American female. The preliminary injunction, which was to remain in effect only "until disposition for permanent injunctive relief or until further order of th[e] court," further mandated the City
 
 
 8
 to develop a broad-based system of competing qualifications of future applicants which measures a number of job-related qualifications and is free from the racial or sexual bias that results from the administration of the single written examination as the sole competitive criterion for appointment.[1]
 
 
 9
 The district court did not make a finding of intentional discrimination, but based its finding of unconstitutional racial discrimination entirely upon evidence that African-Americans as a whole scored lower on the examination than white Americans, and were thus disparately impacted by the exam. With regard to women, the district court found that the gender disparity on the police force was not attributable to the exam, but was solely the result of a veteran's preference point award system, which adds ten points to the raw score of any applicant who is also a U.S. veteran. The court found that the veterans preference system had the practical effect of discriminating on the basis of "what is for all practical purposes a sex-related characteristic, military service"[2] and hence ordered that female applicants be removed from competition against male applicants by being ranked within a separate category and hired according to the one-for-one quota system.
 
 
 10
 The district court neither ordered the City to stop using the 1975 test, nor to develop a new one, postponing any findings regarding the validity of the exam, and ordering the City to perform a validation study after adequate data from actual experience with the exam became available. At issue is whether a content-validation of the exam performed two years later on the basis of the training success of the first class of police cadets taking the exam in 1975 is adequate to satisfy the demands of the injunction, or whether the disparate impact of the exam, absent the court-imposed quota system, would require a grant of permanent injunctive relief on the basis that the City's validation study was a sham to conceal unlawful discriminatory intent.
 
 B.
 
 11
 Because the adequacy of the validation procedure is an issue here, a chronology of the City's efforts and the arguments made on behalf of and against the City are material. In 1975, the City hired PSP Human Resource Development (PSP),[3] a private consultant, to prepare a job analysis of a police officer with the City. In a preliminary effort to gain intimate familiarity with all facets of critical job skills, members of the PSP staff worked directly with police officers on the job, in the police stations or riding in patrol cars, interviewing representatives of all levels of police officer. The completed PSP analysis was performed in accordance with Equal Employment Opportunity Commission guidelines on the format of job analysis, and provides, essentially unchanged, the current police officer job description. From this job analysis, and in consultation with officials in other U.S. cities and from the Civil Service Commission, PSP developed the 1975 police officer exam using as a base model the International Personnel Management Association's generic police officer exam, which in current amended form still predominates as the model exam across the country.
 
 
 12
 In 1977, PSP performed a content-validation of the exam, finding that the written exam exceeded the minimal norms of proof for showing test performance relation to predictive academy performance.[4] Although no study was ever completed directly comparing performance of the police officer on the job with the score achieved on the written pre-training exam, an expert for the Intervenors[5] testified that the written exam tested aptitude for memory, observation, reading comprehension, and interpretive and communicative skills, areas covered by the training academy and essential to the job of police officer. The City's consultants also performed adverse impact calculations for the exam administered between the years 1987 through 1990 and found that, based upon a minimum pass rate of 75% and upon standards set forth in the federal regulations,[6] the exam had no legally cognizable adverse impact upon minorities or women. In 1983, and again in 1988, the same consultants performed a validation of the City's written psychological screening tests,[7] concluding that those exams also provided very powerful prediction of job performance as well as of absenteeism.
 
 
 13
 In response to the Intervenors' evidence, the Commonwealth submitted the testimony of its own statistical, testing and psychology expert[8] who raised questions concerning the validation studies of the ranking exam and the written portions of the psychological exams. Most notably, the Commonwealth's expert found that the validation did not directly correlate job performance to test score, that the ranking test did not measure aptitude for some of the skills identified by the police officer job analysis as essential to an officer's performance on the job, and that PSP did not base its reports on adequate data. Furthermore, the Commonwealth's expert criticized the relevancy of the application of the Federal Regulations to determine adverse impact of the exams on minorities and women, alleging that the formula provided by the federal regulation, applied as it was to a passing minimum score of 75%, is not probative of discriminatory impact because disparate impact is only discernible in the much higher score range needed to maintain one's eligibility. The Commonwealth's expert refused to opine, however, that either the written exam or the psychological tests were without validity, and also refused to advocate any specific alternative selection procedure, stating only that the evidence he reviewed was inconclusive.
 
 C.
 
 14
 Despite the results of the City's validation studies and the City's implementation of a vigorous and highly successful minority and female recruitment program, the City never appealed the issuance of the preliminary injunction. Similarly, the Commonwealth never sought to pursue its request for permanent injunctive relief under the Supreme Court's subsequently articulated constitutional standard for discrimination, leaving the preliminary injunction unabated for almost 16 years.
 
 
 15
 Four white male candidates, who were rejected for employment under the quota system despite their high test scores, moved to intervene in 1991, claiming that the preliminary injunction placed them, and similarly situated white male applicants, at a competitive disadvantage in violation of their constitutional equal protection rights. The Intervenors successfully obtained dissolution of the preliminary injunction by order of the district court dated March 20, 1991.[9] The Intervenors then moved in the district court for an award of attorney fees pursuant to 42 U.S.C. § 1988, promulgated under the Civil Rights Attorney Fees Act of 1976, and for dismissal for failure to prosecute, or in the alternative for summary judgment, during which time the Commonwealth's appeal of the dissolution of the preliminary injunction was pending. In light of the district court's September 9, 1991, grant of partial summary judgment on the issues of police hiring procedures and attorney's fees, we held the Commonwealth's appeal was mooted. The Intervenors' motion to dismiss for failure to prosecute was denied. The Commonwealth then moved to alter or amend the judgment, alleging genuine issues of material fact, which was denied by order of the district court, December 16, 1991, after the district court disallowed further discovery in light of the passage of time, the extensive stipulations and examination of the substantial amounts of evidence taken in previous years and in the 1991 hearings. This is the Commonwealth's appeal from that final judgment.
 
 III.
 A.
 
 16
 It is undisputed that dissolution of the preliminary injunction and denial of a permanent injunction will almost certainly result in a return to white males predominating on the police force, notwithstanding the City's vigorous recruitment efforts aimed at minorities and women. The main issue for our review, however, is not whether disparate impact will eventually become discernable again, but whether this effect is cognizable under the Constitution and the statutory provisions under which this case was brought.
 
 
 17
 Review of the district court's entry of summary judgment is plenary. Colgan v. Fisher Scientific Co., 935 F.2d 1407 (3d Cir.), cert. denied, --- U.S. ----, 112 S.Ct. 379, 116 L.Ed.2d 330 (1991). We are "required to apply the same tests the district court should have utilized initially. Inferences to be drawn from the underlying facts contained in the evidential sources submitted to the trial court must be viewed in the light most favorable to the party opposing the motion." Goodman v. Mead Johnson and Company, 534 F.2d 566, 573 (3d Cir.1976), cert. denied, 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977).
 
 
 18
 The district court issued the preliminary injunction in 1975 on the legal basis that Title VII of the Civil Rights Act of 1964 provided an appropriate standard for determining racial or gender discrimination under equal protection.[10] Under Title VII a civil rights claimant need not establish discriminatory purpose, but may rely solely on evidence of disparate impact. Six months after the preliminary injunction was issued however, the Supreme Court held in Washington v. Davis, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), that intent is a prima facie element of any Constitution-based civil rights claims of discrimination, and thus the Supreme Court distinguished the constitutional standard for discrimination from the standard promulgated under Title VII. Id. at 238-39, 96 S.Ct. at 2047. The Court held that disparate impact, without more, will not trigger strict scrutiny of racial classifications, unless the disparate impact cannot be rationally explained on non-racial grounds. Id. at 242, 96 S.Ct. at 2049. Hence under Davis, in order to justify permanent judicial intervention, the Commonwealth has the burden of proving that the City's hiring method is purposefully discriminatory. See also, Personnel Administrator of Massachusetts v. Feeney, 442 U.S. 256, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979) ("intent" for purposes of an equal protection claim means that the City "selected or reaffirmed a particular course of action at least in part because of, not merely in spite of, its adverse effects upon an identifiable group." Id. at 279, 99 S.Ct. at 2296 (emphasis in original) (footnote and citation omitted)); McCleskey v. Kemp, 481 U.S. 279, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987).
 
 
 19
 It is now well established that a prima facie showing of discriminatory intent may be proven indirectly, without a "smoking gun," on the "totality of the relevant facts," including disparate impact if coupled with some other indicia of purposeful discrimination. The burden of proof then shifts to the defending party. Davis, 426 U.S. at 242, 96 S.Ct. at 2049; see also Chipollini v. Spencer Gifts, Inc., 814 F.2d 893 (3d Cir.1987), cert. dismissed, 483 U.S. 1052, 108 S.Ct. 26, 97 L.Ed.2d 815 (1987) (plaintiff entitled to show employer's explanation for termination of employment was pretext by proffering indirect evidence). We must take into consideration, however, that in Davis, the Supreme Court held that the discriminatory impact of the facially neutral police officer's test at issue in that case, without more, does not warrant the conclusion or the inference that the test was a discriminatory device. Thus, under the Davis standard, the evidence submitted by the Commonwealth must provide more than evidence of disparate impact in order to prove intentional discrimination by the indirect method and to secure for the Commonwealth permanent injunctive relief.
 
 B.
 
 20
 Based upon all the evidence before the district court viewed in a light most favorable to the Commonwealth, the district court held in its March 20, 1991 decision that there was an absence of sufficient evidence to support the Commonwealth's burden of proving intentional discrimination, either directly or indirectly. Applying this same standard to the facts, we reach the same decision as did the district court. The City's training academy has been shown to be essential to the development of skills critical to a police officer's on-the-job performance, making direct validation of the exam to job performance superfluous given the content validation linking the exam to academy performance. The Assistant Director, Secretary and Chief Examiner for the City's Department of Personnel and Civil Service testified for the Intervenors with specificity about the areas tested on the exam and how they directly coincide with the critical skills identified by PSP's extensive police officer job analysis. In addition, the parties stipulated and it was reflected in the Opinion and Findings of the district court in 1975 that "the written test administered on April 21, 1975 was as good a test as any available to measure job-related areas of the entry level position of police officer."[11]
 
 
 21
 The correlation established by the City's validation studies between the written test score of the police department's ranking exam and the trainability of police academy candidates is sufficient to demonstrate the required nexus between the exam and job performance, see Davis, 426 U.S. at 236, 96 S.Ct. at 2046, since the test is directly validated to the training program, which is itself indispensable to job performance. Here, the police officer program provides training in critical aspects of a police officer's job and the written exam measures aptitude for acquiring those critical skills which are covered by the training. The City's consultants provided content validation of the exam to performance in the academy, and notwithstanding the Commonwealth's allegation that the study could have achieved a higher degree of statistical accuracy, the Commonwealth did not present evidence that the test was per se invalid or that the City believed the validation study to be substandard such as to allow an inference of sham. To the contrary, the Director of Research for PSP testified that in his professional experience, he had never seen so high a correlation between test performance and academy performance in other cities and that the overall process of selecting candidates, including the written ranking exam and the two screening psychological exams, were "probably stronger than any that [he] kn[e]w of in the United States." (R. at 259).[12]
 
 
 22
 We note that one expert's opinion as to the inconclusiveness of the validation evidence, in contravention of other expert testimony, does not of itself provide a sufficient basis for a finding of mere pretext or sham veiling the City's alleged discriminatory design. The evidence viewed in a light most favorable to the Commonwealth, even assuming the irrelevancy of the adverse impact calculations, shows an exceptionally high correlation co-efficient between test score and training success, and suggests that the written examination is a reasonable measure of aptitude for some of the most critical skills required for success as a police officer. In light of the evidence presented, we cannot infer intentional discrimination on the part of the City in the administration of the written examination or in the validation process of the examination. Similarly the evidence does not establish that the psychological screens are not reasonable, and the Commonwealth has made no allegation that they disparately impact minorities or women.
 
 
 23
 On summary judgment, the district court appropriately applied the Davis standard of intent and found the Commonwealth did not sustain its burden in showing that the City's validation efforts were so insubstantial as to permit an inference of purposeful discrimination or sham. The Commonwealth offered nothing beyond a showing of disparate impact that could affirmatively counter the Intervenors' motion, and hence has not met its burden of proof under Davis. We deem the purpose of the preliminary injunction to have been satisfied, see, Board of Education v. Dowell, 498 U.S. 237, 111 S.Ct. 630, 637, 112 L.Ed.2d 715 (1991), and no grounds exist for a grant of a permanent injunction.
 
 
 24
 A second Supreme Court case bears on the outcome of the present case. In Personnel Administrator of Massachusetts v. Feeney, 442 U.S. 256, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979), the Supreme Court held that veterans preference does not violate equal protection, preempting the Commonwealth's argument in support of a gender discrimination claim. Although veterans preference is not directly challenged in this suit, there was evidence, unrefuted, that the application of veterans preference points to the raw test score disadvantages women in the hiring practices of the City.[13] Because the veterans preference add-on point award system is constitutional under Feeney, we cannot infer gender discrimination in its use by the City.
 
 
 25
 Although we acknowledge the likelihood that the City's competitive hiring process, absent the injunction, will disparately impact minorities and women, in light of Davis and Feeney we cannot say that the Commonwealth has proven that the police department's hiring practices do not comply with the dictates of the Constitution. The affirmative efforts of the police department to recruit minority and female officers and the relation of the test to the training academy negate any inference of intentional discrimination. The propriety of the district court's action is predicated upon the record before it, which viewed in the light most favorable to the non-moving party, does not support either a showing of intent, the only material issue under Davis, or a justification for further discovery. Since the Commonwealth has not met its burden of showing intentional discrimination, and the City's hiring procedures therefore cannot be said to violate the Constitution, the Intervenors' petition to dissolve the preliminary injunction was properly granted and permanent injunctive relief was properly denied. We will affirm the district court on the issues raised in the Commonwealth's appeal.
 
 IV.
 
 26
 Although the district court issued a final judgment on the merits of the injunction, it failed to issue a final order with regard to the attorney's fee award, purporting instead to decide the merits of the award while postponing a determination of the actual amount of attorney's fees until the outcome of this appeal. Despite the fact that it was incumbent upon the City to pursue the dissolution of the preliminary injunction, and the City failed to do so, the district court, in a highly unusual opinion, assessed the Intervenors' unquantified attorney's fees against the Commonwealth and the City in the ratio of 75% to 25% respectively. Setting aside the difficulty we have in justifying the district court's characterization of the Commonwealth as a civil rights "defendant" for purposes of imposing attorney's fees, we must first decide our jurisdiction over the non-final portion of the district court's order. Although the parties do not contest the issue of appellate jurisdiction, we have the duty to raise the issue sua sponte. See Eavenson, Auchmuty & Greenwald v. Holtzman, 775 F.2d 535, 537 n. 1 (3d Cir.1985).
 
 
 27
 The general rule is that we do not have appellate jurisdiction over a non-final order, St. Louis, I.M. and S.R. Co. v. Southern Express Company, 108 U.S. 24, 28-29, 2 S.Ct. 6, 8, 27 L.Ed. 638 (1883); Catlin v. United States, 324 U.S. 229, 233, 65 S.Ct. 631, 634, 89 L.Ed. 911 (1945), and therefore, an unliquidated attorney's fee award would not be appealable. In Frangos v. Doering Equipment Corp., we stated that "it has long been the rule in this circuit that this court lacks jurisdiction to examine the merits of an attorneys' fee award where the award has not been quantified." 860 F.2d 70, 72 (3d Cir.1988) (dismissing portion of appeal pertaining to attorney's fees, but assuming jurisdiction over underlying merits claim). See also, Saber v. FinanceAmerica Credit Corp., 843 F.2d 697, 703 (3d Cir.1988); Becton Dickinson & Co. v. District 65, United Auto., etc., 799 F.2d 57 (3d Cir.1986); Bandai America, Inc. v. Bally Midway Mfg. Co., 775 F.2d 70, 75 (3d Cir.1985), cert. denied, 475 U.S. 1047, 106 S.Ct. 1265, 89 L.Ed.2d 574 (1986); In re Colon, 941 F.2d 242 (3d Cir.1991); Confer v. Custom Eng'g Co., 952 F.2d 41 (3d Cir.1991).
 
 
 28
 Although most of our sister circuits have held that a decision on fee entitlement is not final and appealable until quantified, some courts have assumed jurisdiction over an otherwise nonappealable aspect of a district court's order when the order is final with regard to the substantive merits of the disposition. See e.g., Andrews v. Employees' Retirement Plan of First Alabama Bancshares, Inc., 938 F.2d 1245, 1247-48 (11th Cir.1991); John v. Barron, 897 F.2d 1387, 1390 (7th Cir.), cert. denied, 498 U.S. 821, 111 S.Ct. 69, 112 L.Ed.2d 43 (1990); Vandenplas v. Muskego, 797 F.2d 425, 428 n. 1 (7th Cir.1986); Gilles v. Burton Construction Co., 736 F.2d 1142, 1145-46 (7th Cir.1984); Bittner v. Sadoff & Rudoy Industries, 728 F.2d 820, 826-27 (7th Cir.1984); Morgan v. Union Metal Mfg., 757 F.2d 792 (6th Cir.1985). Thus although an award of unquantified fees is interlocutory and hence not subject to appellate review as a general rule, the interest of judicial economy and orderliness in the administration of justice may require an appellate court to assume jurisdiction on matters beyond the ordinary scope of appellate jurisdiction. Nevertheless, even in those jurisdictions which recognize the exception to the general rule, the norm is that "an award of attorney's fees which does not fix the amount of the award or specify a formula allowing the amount to be computed mechanically is not a final decision within the meaning of 28 U.S.C. § 1291." John v. Barron at 1389 (quoting Lac Courte Oreilles Chippewa Ind. v. Wisconsin, 829 F.2d 601, 603 (7th Cir.1987) (collateral-order exception to the rule requiring appellant to show irreparable harm if appeal is postponed)).
 
 
 29
 We have declined to adopt a liberal view of any exception to the general rule. In Schake v. Colt Industries Operating Corp. Severance Plan etc., 960 F.2d 1187 (3d Cir.1992), we did assume jurisdiction over the district court's unliquidated award of attorney's fees, but that case is unique on its facts because there the district court attempted to issue an attorney's fee award long after it had lost jurisdiction. Where the district court is without jurisdiction to enter such a post-judgment order, a right of review under § 1291 arises. Demeretz v. Daniels Motor Freight, Inc., 307 F.2d 469, 471-72 (3d Cir.1962). Post-judgment orders are final for purposes of § 1291 and immediately appealable because the policy against piecemeal review is unlikely to be undermined.
 
 
 30
 In the present case, the district court's award of attorney's fees to the prevailing party pursuant to § 1988 raises issues collateral to the main underlying merits determination and predicate to a subsequent judgment of a fixed award amount. Nevertheless, because the district court specified the award in terms of a proportion of an undetermined amount, we must consider whether the district judge provided a sufficiently mechanical formula such that the award may be considered a final decision within the meaning of § 1291. In Becton Dickinson & Co. v. District 65, United Auto., etc., 799 F.2d 57, 61-62 (3d Cir.1986), we did not review the district court's order directing an award of "reasonable attorney fees" which had not been reduced to a definite amount, notwithstanding our jurisdiction over the merits. We held that such an indeterminate amount, though measured against a standard of reasonableness, is not final within the meaning of § 1291. A final decision must "end[ ] litigation on the merits and leave[ ] nothing for the court to do but execute the judgment." Firestone Tire & Rubber Co. v. Risjord, 449 U.S. 368, 373, 101 S.Ct. 669, 673, 66 L.Ed.2d 571 (1981) (quoting Coopers & Lybrand v. Livesay, 437 U.S. 463, 467, 98 S.Ct. 2454, 2457, 57 L.Ed.2d 351 (1978)); St. Louis I.M. & S.R. Co. v. Southern Express Co., 108 U.S. 24, 28-29, 2 S.Ct. 6, 8, 27 L.Ed. 638 (1883). In the interest of our concern for judicial economy, we concluded that deciding the merits of the attorney's fee issue would not preclude the likelihood of a second appeal on the actual amount awarded after the fee determination, and held that "the jurisdictional rules precluding review of non-final orders [is] ... firmly entrenched." Becton Dickinson at 61-62; see also United States v. Sleight, 808 F.2d 1012, 1015 (3d Cir.1987).
 
 
 31
 In light of the fact that we have held that an award of "reasonable" attorney's fees is not final for purposes of § 1291, an award of a "proportionate" amount of reasonable attorney's fees also lacks the necessary element of finality for purposes of § 1291. Furthermore, the likely potential of an appeal on the actual fee determination mitigates any public policy argument based on judicial economy for reviewing the district court's order on the fee issue. Where an attorney's fee statute complements an adjudication of substantive rights, there is no foolproof avoidance of multiple appeals. Since our resolution at this time would be at best an ambiguous service to judicial economy, we cannot assume jurisdiction until fees are fixed, at least in the absence of a showing of hardship to the parties or a compelling interest of the judicial system which would beg some loosening of the demand for "final" orders for purposes of § 1291.[14]
 
 V.
 
 32
 For the foregoing reasons, we will affirm the district court's judgment granting summary judgment on the issue of the dissolution of the preliminary injunction, which we regard as a denial of a request for permanent injunctive relief. We will also affirm the district court's denial of the motion to dismiss for failure to prosecute. We will dismiss that portion of the Commonwealth's appeal relating to attorney's fees for lack of jurisdiction.
 
 
 
 [1]
 Pennsylvania v. Flaherty, 404 F.Supp. 1022, 1031 (W.D.Pa.1975)
 
 
 [2]
 Id. at 1028
 
 
 [3]
 PSP is a consulting firm which offers consultation and assessment of employee attitude surveys, with a significant part of their business being assessment of police officers across the United States
 
 
 [4]
 Dr. William Sullivan, Director of Research for PSP and professional member of the American Psychological Association, performed the validation study and testified on behalf of the Intervenors
 
 
 [5]
 Michele Cunko, Assistant Director, Secretary and Chief Examiner for the City of Pittsburgh, Department of Personnel and Civil Service, and responsible for developing and maintaining testing procedures for the City police officers, testified for the Intervenors
 
 
 [6]
 The federal government has provided a formula for calculating adverse impact of selection processes. According to EEO regulations:
 A selection rate for any race, sex or ethnic group which is less than four-fifths ( 4/5) (or eighty percent) of the rate of the group with the highest rate will generally be regarded by the federal enforcement agencies as evidence of adverse impact....
 
 
 [29]
 C.F.R. § 1607.4(D)
 
 
 [7]
 In addition to the written ranking exam, the City employs a number of other screening mechanisms, including the administration of two psychological instruments, the revised Minnesota Multi-Phasic Personality Inventory (MMPI), and the Guilford-Zimmerman temperament survey. The Guilford-Zimmerman test had already been validated for use in hiring of security guards for the City, and PSP's own study indicated insignificant disparity between either racial or gender groups in the performance on this exam. Considerable research also had been done on the MMPI, which had long been used to assess the emotional stability of police candidates. Dr. Sullivan testified on direct that both exams were submitted to counsel for the Commonwealth for its approval, pursuant to the terms of the preliminary injunction, before they were administered
 
 
 [8]
 Anthony Nitko, Ph.D., a professor of education at the University of Pittsburgh, testified on behalf of the Commonwealth
 
 
 [9]
 Pennsylvania v. Flaherty, 760 F.Supp. 472 (W.D.Pa.1991)
 
 
 [10]
 Pennsylvania v. Flaherty, 404 F.Supp. 1022, 1028-29 (W.D.Pa.1975)
 
 
 [11]
 Id. at 1026
 
 
 [12]
 The Commonwealth also presented the testimony of Commander Gwendolyn Elliot of the City's police department, and Alma Fox, a member of the Pittsburgh Human Relations Commission, in an effort to demonstrate vestiges of historical discrimination and a residual discriminatory attitude on the part of the City so as to impeach the City's averments that it is committed to minority and female recruitment. Commander Elliot testified that she believes women and African-Americans are not given comparable promotion and assignment opportunities to white males. (R. at 475-78). Alma Fox testified that a Commission study recommended some changes in the City's selection process, including involving more women and minorities in positions of evaluating applicants throughout the screening process. (R. at 492-94). As the district court found, neither of these witnesses presented compelling evidence that the City intentionally discriminates in its hiring procedures, the issue before us. To the extent their testimony nevertheless purported to reveal a possibly pervasive discriminatory attitude on the part of the City, we note that both admitted significant improvement and responsiveness on the part of the City. (R. at 478 and 495)
 
 
 [13]
 In a stipulation of facts entered into between the City and the Intervenors, and in which the Commonwealth joined with regard to the authenticity of the numbers, the average raw score of female applicants on the eligibility list between July, 1989 and July, 1990, was 86.3, as compared to 87.3 for male applicants. This represents 95.5 percent of the male applicant pass rate (R. at 140), more than the four-fifths pass rate required under Federal Regulations to be deemed free from discriminatory impact. However, after adding veterans preference points, women's scores only increased on the average a percentage of one point to 86.6, while men's scores increased more than two points to 89.7, allowing men with lower raw scores to supersede women on the eligibility lists (R. at 143). The evidence submitted by the Commonwealth's expert indicated that in some years white females' raw score actually surpassed that of white males, but nevertheless, many females were eliminated after veterans preference points were added
 
 
 [14]
 In determining that we do not have jurisdiction to consider the attorney fee issue at this time, we are not in any way approving the preliminary allocation made by the district court