NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 18-3794
_____

MODUPE WILLIAMS,
                                        Appellant

v.

PENNRIDGE SCHOOL DISTRICT; TOM CREEDEN;
NICHOLAS SCHOONOVER
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civ. No. 2-15-cv-04163)
District Judge:  Honorable Mitchell S. Goldberg
_____

Submitted under Third Circuit L.A.R. 34.1(a)
June 28, 2019

BEFORE:  CHAGARES, GREENAWAY, JR., and GREENBERG, Circuit Judges.

(Filed: July 30, 2019)
_____

OPINION*
_____

GREENBERG, Circuit Judge.


_____

*This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not
constitute binding precedent.

## I.     INTRODUCTION

This matter comes on before this Court on the appeal of plaintiff-appellant,

Modupe Williams, challenging an order of the District Court of August 7, 2017, under

Fed. R. Civ. P. 12(b)(6) dismissing retaliation claims she asserted against defendants,

Pennridge School District, Tom Creeden, and Nicholas Schoonover, and an order of the

Court of December 6, 2018, under Fed. R. Civ. P. 56 granting summary judgment against

racial and gender discrimination claims that she asserted on the same three defendants.

See Williams v. Pennridge Sch. Dist., No. 15-4163, 2018 WL 6413314 (E.D. Pa. Dec. 6,

2018).  Creeden and Schoonover are principals of Pennridge High School at which

Modupe was a student.  The District Court had jurisdiction under 28 U.S.C. §§ 1331 and

1332 and we have jurisdiction under 28 U.S.C. § 1291.  For the reasons stated below, we

will affirm the District Court's appealed orders.


## II.     FACTUAL BACKGROUND

We recite the relevant facts from the record viewing them in the light most

favorable to Modupe.[1]  Modupe, a female African-American, was a student at Pennridge

High School during the times germane to this opinion.  Between 2010 and 2012, while

she was a student at Pennridge, there were seven incidents which she alleged constituted

discrimination against her by defendants as well as discrimination and harassment against

her by fellow students who are not defendants in this case.  The first incident was in the

---

[1] Our use of Modupe Williams's first name in this opinion is not because of a lack of
respect for her.  Rather we do so because we refer to her mother, Deborah Williams, in
this opinion and use their first names to avoid confusion.

2

2010-2011 school year, when she received a Presidential Award for academic merit and was the only African-American student at Pennridge that year to receive the award. At the award ceremony, her name was not announced and she was the only student to receive the award whose name was not mentioned. After the ceremony, she confronted the guidance counselor, Gina Dubona, and expressed her upset at not having been publicly recognized at the ceremony. Dubona told her a mistake had been made and apologized. Nevertheless, Modupe alleged in her complaint that the omission was discriminatory because she was the only student to receive the Presidential Award whose name was not called and because the guidance counselor was dismissive when Modupe complained of the omission.

The second incident was in the following school year, while Modupe was enrolled in a 19th Century American Culture class that Cara Lyn Gurysh taught. On January 6, 2012, she was working on a group project in the computer lab. At some point, with permission, she went to the bathroom, leaving her belongings at her computer when she did so. When she returned, her backpack had been moved and a Caucasian boy named Sammy had taken the seat that had been hers. She protested to Sammy stating "excuse me, I was sitting there", to which he replied, "well, not anymore." Williams, 2018 WL 6413314, at *1. She informed Gurysh of what had happened to which Gurysh responded, "oh, well, you can go to the library where there[ are] computers there and you work by yourself over there." Id. Modupe believes that there was a racial motivation underlying the incident because "there was no reason that [Gurysh] should have given Sammy the

3

seat, the white boy, . . . instead of having him go down to the library, being that [she] was using the computer first." Id. (first and last alteration in original).

Modupe and her mother, Deborah Williams, complained about the incident to Gurysh. Deborah testified at her deposition that her multiple attempts to contact Gurysh about the matter had not been successful until she saw Gurysh in a school hallway. When Deborah asked Gurysh why she never followed up on the computer matter, Deborah testified Gurysh stated that "she felt it wasn't important." Id. at *2. When deposed, Gurysh stated that she routinely sent students to the library when all of the computers in the lab were in use, and that she sent students she knew would continue to work and kept students with behavioral problems closer to her. She said she trusted Modupe to work diligently and indicated that Modupe was the only student sent to the library on that day. Gurysh also stated that she apologized to Modupe for the incident.

The third incident started in early 2012, prior to the school's spring break. At that time Modupe began receiving phone calls on her cell phone from a private number that she did not answer. On April 4, 2012, the first day of spring break, she was at her grandmother's home when someone called her cell phone from a private number. Beginning with this call and continuing to April 6, 2012, she answered approximately 19 phone calls in which the callers described her as "b**ch" and made sexually vulgar statements along the lines of "you know us n**gers like to f**k in the ass." Id. The words "b**ch" and "n**ger" were used in multiple phone calls. Id. In one call, the caller asked, "how f***ing drunk were your parents when they named you Modupe?" Id. Many times, Modupe simply hung up on the calls.

4

On Easter Sunday, Modupe told her mother, Deborah Williams, about the phone calls. Deborah then began to answer these calls pretending to be Modupe. The callers were young males who made explicit, racist, and sexual comments to Deborah similar to those that had been made to Modupe. During one of these calls, the caller revealed himself as Tom K. or Tom Kantner. That same night, Deborah called the police about the matter. According to the police, Modupe indicated that the calls came as a surprise, that she had not received similar calls in the past, and that she had not experienced harassment at school prior to the calls. The police obtained phone records that identified the callers as Frankie Buccafuri, Tom Kantner, and Henry Savage.

On April 10, 2012, Modupe reported having received the phone calls to the Pennridge assistant principal, defendant Nicholas Schoonover. Schoonover listened to the recordings of some of the phone calls and was informed that the police were involved. Schoonover told Modupe that because none of the calls were made at the school, it was not a school issue. Nevertheless, that same day, Schoonover met with Buccafuri, Kantner, and Savage individually, but each denied involvement. Schoonover also contacted the police about the calls but they told him that "this was a community issue" and "was not related to in school." Id. at *3. Moreover, they advised him not to have any involvement in the matter. Id. However, at Deborah's request, Schoonover met with Buccafuri, Kantner, and Savage a second time about the calls.

Eventually, the juvenile authorities initiated proceedings against Buccafuri, Kantner, and Savage, which led to their being placed on probation. Aspects of their probation required that they write a letter of apology to Modupe and perform community

5

service. Modupe was satisfied with this disposition, and there were no reports of any additional phone calls or harassment by the boys, nor any indication that she had any contact with them after the incidents we have described.

Following the phone calls, there were three more incidents involving other students that Modupe considered harassing. First, she testified that she heard, through the mother of a friend, that during the week immediately following spring break, another girl said that Buccafuri was telling other students in gym class about making the harassing phone calls. Second, when Modupe confronted another student about cheating off of her work in class, he responded, "are you going to call the cops on me too?" Id. at *11. She believed that the reference to the police related to the phone calls incidents. Lastly, she overheard an unidentified boy in a school hallway commenting to his friends "something along the lines of how drunk were you when they named you Modupe," an apparent reference to one of the phone calls. Id. At her deposition Modupe conceded that none of these boys was speaking to her directly, nor was there any evidence that they intended her to hear the comment.

The last incident was on May 25, 2012. Schoonover met with Modupe, Deborah, and guidance counselor Lori D'Angelo to discuss Modupe's completion of the school year and her plans for the next school year and beyond. Deborah confided that Modupe had been seeing a therapist and had been taking medication. The participants at the meeting discussed the possibility of Modupe's finishing the year with homebound instruction. Schoonover suggested that Modupe should be hospitalized over the summer,

6

attend an alternative school in the fall, and, when she was ready to cope, return to Pennridge.

On May 31, 2012, a few days before the end of the school year, Deborah met with Schoonover and defendant principal Tom Creeden, and presented them with a written complaint, alleging that Modupe had been the subject of discrimination on the basis of her race and gender during the incidents we describe above. However, Deborah did not leave a copy of the complaint with defendants and they did not investigate the matters. Modupe and Deborah did not reach out to the school again, and before the start of the next school year, they relocated out of the school district so Modupe no longer was a Pennridge student.

On July 29, 2015, Modupe filed this suit against the school district, Creeden, and Schoonover. In her second amended complaint, she pleaded claims for: (1) race discrimination by the school district in violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d; (2) gender discrimination by the school district in violation of Title IX of the Education Amendments Act of 1972, 20 U.S.C. § 1681(a); (3) race and gender discrimination by all defendants in violation of the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Cons. Stat. Ann. § 953; (4) violation of the Equal Protection Clause of the Constitution by all defendants under 42 U.S.C. § 1983; (5) retaliation under Title VI by the school district; (6) retaliation under Title IX by the school district; and (7) retaliation under the PHRA by all defendants. On defendants' motion, the District Court dismissed the retaliation claims on August 7, 2017. At the close of discovery, defendants moved for summary judgment on the remaining claims

7

which was granted on December 6, 2018.  See Williams, 2018 WL 6413314.  Modupe

appeals from both dispositions.


## III.    DISCUSSION

### A.    Motion to Dismiss

We first will address the District Court's dismissal of Modupe's retaliation claims.

We review de novo a district court's dismissal under Rule 12(b)(6) for failure to state a

claim upon which relief may be granted.  Geness v. Cox, 902 F.3d 344, 353 (3d Cir.

2018).  In determining whether a plaintiff states a claim under Rule 12(b)(6), "we accept

all well-pleaded allegations as true and draw all reasonable inferences in favor of the

plaintiff.  However, we disregard threadbare recitals of the elements of a cause of action,

legal conclusions, and conclusory statements."  City of Cambridge Ret. Sys. v. Altisource

Asset Mgmt. Corp., 908 F.3d 872, 878-79 (3d Cir. 2018) (internal quotations and

citations omitted).  "A claim has facial plausibility when the plaintiff pleads factual

content that allows the court to draw the reasonable inference that the defendant is liable

for the misconduct alleged."  Zuber v. Boscov's, 871 F.3d 255, 258 (3d Cir. 2017)

(quoting Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 1949 (2009)).

In order to establish a retaliation claim, a plaintiff must show that she (1) engaged

in constitutionally protected conduct, (2) suffered an adverse action at the hands of a

public official, and (3) her constitutionally protected conduct was a substantial or

motivating factor in the adverse action.  Watson v. Rozum, 834 F.3d 417, 422 (3d Cir.

2016).  Adverse action, in this context, must be "sufficient to deter a person of ordinary

8

firmness from exercising his [constitutional] rights." Rauser v. Horn, 241 F.3d 330, 333

(3d Cir. 2001) (citation omitted) (alteration in original).

> Because motivation is almost never subject to proof by direct evidence, [Plaintiff] must rely on circumstantial evidence to prove a retaliatory motive. [She] can satisfy [her] burden with evidence of either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing that suggests a causal link.

Watson, 834 F.3d at 422. We apply the same standard for a retaliation claim whether

raised under Title VI, Title IX, or the PHRA. See Woodson v. Scott Paper Co., 109 F.3d

913, 920 (3d Cir. 1997); Peters v. Jenney, 327 F.3d 307, 320-21 (4th Cir. 2003).

Modupe argues that defendants retaliated against her for making her formal May

31, 2012 complaint to which we have referred as well as her numerous informal verbal

complaints by (1) allowing other students to harass her at school, (2) making the

"hospitalization" comment, (3) "de facto" removing her from the school district, and (4)

delaying release of her transcript to her new school.[2] The District Court found that none

of these actions qualified as an "adverse action" under the retaliation standard. We agree.

To begin, none of the defendants actually harassed Modupe. Instead, her harassment

theory posited that defendants retaliated against her by allowing her fellow students to

harass her without taking corrective action. But with the exception of the phone calls, the

harassing incidents of which she complains were isolated from each other, and

defendants took action to address the harassing phone calls. In fact, much of what

---

[2] We assume, for the purposes of this opinion, that Modupe engaged in constitutionally protected conduct.

9

Modupe considers harassment was not harassment at all—she simply overheard or later learned of unflattering comments by other students about her that were not made to her directly.

In any event, we are unsure what corrective action defendants could have taken beyond what they did. Moreover, Modupe does not explain why retaliation was the motivating factor in defendants' alleged failure to act, given that the harassment began before she made her complaints and not because of the complaints.[3]

The rest of the alleged retaliatory actions were simply offshoots of her harassment claim. Defendants did not take any affirmative actions against Modupe. The suggestion for hospitalization came after defendants learned of her difficulty in dealing with the harassment by fellow students. But defendants did not inform or advise her that she should not attend Pennridge any longer—she decided to leave voluntarily. They also did not withhold her transcript to her new school—there was simply a delay in sending it.[4]

---

[3] Indeed, Modupe's allegations, taken as a whole, appear to argue that defendants retaliated by not taking action on her complaints. We fail to see how the lack of response to a complaint sufficiently would deter a person of ordinary firmness from exercising her rights.

[4] Modupe seems to regard the failure to provide the transcript to her new school more promptly as a significant event, arguing that it would deter a reasonable person from filing complaints. However, when she wanted the transcripts sent she was no longer a student at Pennridge. We fail to see why the delay would deter her from exercising her rights at the new school or continuing her complaints against defendants. We also do not understand her reliance on our decision in EEOC v. L.B. Foster Co., 123 F.3d 746 (3d Cir. 1997), to support this assertion—that case was an attorney's fees dispute, and the underlying retaliation claim was decided against the plaintiff, which on appeal we did not overturn.

10

These allegations do not facially state a claim of retaliation. In sum, we will affirm the Court's dismissal of Modupe's retaliation claims.

B.      Summary Judgment

We review a district court's grant of summary judgment de novo. Bradley v. W. Chester Univ. of Pa. State Sys. of Higher Educ., 880 F.3d 643, 650 (3d Cir. 2018). "Our review of the District Court's [summary judgment] decision is plenary, and we apply the same standard as the District Court to determine whether summary judgment was appropriate." State Auto Prop. & Cas. Ins. Co. v. Pro Design, P.C., 566 F.3d 86, 89 (3d Cir. 2009). "Thus, summary judgment is properly granted 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Sconiers v. United States, 896 F.3d 595, 597 n.3 (3d Cir. 2018) (quoting Fed. R. Civ. P. 56(a)).

Modupe asserted that defendants discriminated against her because of her race and gender. She raised claims under Title VI for racial discrimination, Title IX for gender discrimination, the Equal Protection Clause, and the PHRA. The hallmark of all of these claims is intentional discrimination. Alexander v. Sandoval, 532 U.S. 275, 283, 121 S.Ct. 1511, 1518 (2001) (Title VI); Jackson v. Birmingham Bd. of Educ., 544 U.S. 167, 173, 125 S.Ct. 1497, 1504 (2005) (Title IX); Chambers ex rel. Chambers v. Sch. Dist. Of Phila. Bd. of Educ., 587 F.3d 176, 196 (3d Cir. 2009) (Equal Protection Clause); Fasold v. Justice, 409 F.3d 178, 184 n.8 (3d Cir. 2005) (PHRA).

Intentional discrimination may be proven by either (1) direct evidence of willful discrimination, Fasold, 409 F.3d at 184, or (2) a showing of deliberate indifference by

11

defendants to events adverse to the plaintiff, see Blunt v. Lower Merion Sch. Dist., 767 F.3d 247, 273 (3d Cir. 2014). To establish intentional discrimination by deliberate indifference in a school harassment context, a plaintiff must show that (1) the defendant had substantial control over the harassers, (2) she suffered severe and discriminatory harassment, (3) the defendant had actual knowledge of the harassment, and (4) the defendant failed to correct the harassment. Id. "[I]n order to establish deliberate indifference, a plaintiff must show that the [defendant] had knowledge of the alleged misconduct and the power to correct it but nonetheless failed to do so." Id. (citations omitted).

Modupe relied on evidence of the aforementioned seven incidents as support for her discrimination claims: (1) the omission of her identification at the award ceremony; (2) the computer lab incident; (3) the "hospitalization" comment; (4) the harassing phone calls; (5) the student talking about his phone calls; (6) the "cops" comment; and (7) the hallway comment. The first three appear to be attempts to allege willful discrimination, while the latter four appear to be attempts to allege deliberate indifference to adverse action against her. We are satisfied that all seven incidents, taken separately or as a whole, fail to establish a prima facie case of intentional discrimination.

With regard to willful discrimination, the only evidence of intent Modupe proffered to support her claim was to draw an inference that defendants acted against her because she was an African-American female. But as we have repeatedly held, evidence of disparate treatment, alone, is insufficient to establish discriminatory intent. PG Publ'g Co. v. Aichele, 705 F.3d 91, 116 (3d Cir. 2013); Cmty. Servs. Inc. v. Wind Gap Mun.

12

Auth., 421 F.3d 170, 182 (3d Cir. 2005); Commonwealth of Pa. v. Flaherty, 983 F.2d 1267, 1273 (3d Cir. 1993); Kromnick v. Sch. Dist. of Phila., 739 F.2d 894, 911 (3d Cir. 1984). Indeed, even if we ignore defendants' stated non-discriminatory reasons to justify their conduct, there was still no evidence that they had an intent to discriminate. On a summary judgment motion made against a plaintiff's claims the plaintiff has the burden to make a prima facie showing of her claims. See Celotex Corp. v. Catrett, 477 U.S. 317, 331, 106 S.Ct. 2548, 2557 (1986) ("If the nonmoving party cannot muster sufficient evidence to make out its claim, a trial would be useless and the moving party is entitled to summary judgment as a matter of law." (citation omitted)). Modupe's case does not overcome the prima facie case hurdle.

Examined under the deliberate indifference standard, Modupe's claim fails for two reasons. First, with the exception of the phone calls to which defendants cannot be said to have been deliberately indifferent, none of the incidents amounted to severe and discriminatory harassment. Indeed, in two of the three incidents on which she relies as evidence of harassment, the comments made about her by fellow students were not even directed at her—she either overheard, or later found out from a third party about, those comments. It cannot be said that she was "harassed" by fellow students when they had not intended for her to hear those comments. These incidents may be strong evidence that her fellow students disliked her, but they are not evidence of harassment.

Second, Williams did not show that defendants had the power to stop the misconduct but failed to do so. Again, with the exception of the phone calls to which defendants took action, the other incidents were isolated, were not committed by the

13

same students, did not show a pattern capable of repetition, and were not related or linked in any way. Moreover, as we stated above, we are unsure what corrective action defendants could have taken. To the extent she feared other students may continue to make disparaging remarks about her to each other, defendants obviously lacked the power to prevent them from making derogatory comments—while schools may exert substantial control over their students, they do not have the power to command the entire student body to change its opinion of any single student.

As for the phone calls, evidence in the record did not establish a prima facie case of deliberate indifference. Despite the fact that the phone calls were made outside of the school, and that the police informed defendants not to be involved, defendants nevertheless spoke to the offending students on two separate occasions. Moreover, after juvenile charges were filed against the offenders and they were required to apologize formally to Modupe and perform community service, she did not complain that the disposition of the cases was insufficient nor demand further action. And most importantly, she did not receive any more harassing phone call after defendants became involved in the matter. In the circumstances, it is clear that defendants' reaction to the phone calls demonstrated that they were not deliberately indifferent to them. Accordingly, we will affirm the District Court's grant of summary judgment in favor of defendants.

IV.    CONCLUSION

14

For the reasons stated above, we will affirm the District Court's August 7, 2017 order dismissing Modupe's retaliations claims and its December 6, 2018 order granting summary judgment in favor of defendants on the balance of her case.